IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TINA STEINER, | ) | Case No. 3:21-cv-00074 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES G. CARR |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Tina Steiner, seeks judicial review of the final decision of the Commissioner of

Social Security, denying her applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.

Steiner challenges the Administrative Law Judge's ("ALJ") negative findings, contending that

the ALJ misevaluated the opinion evidence from Dr. Thomas Osinowo.  Steiner also contends

that the statute under which the Commissioner of the Social Security Administration ("SSA")

serves is unconstitutional because it violates separation of powers principles.  As a result, she

claims the results of her administrative process must be found invalid.

Because Steiner has not suffered a particularized and traceable injury from the asserted

separation of powers violations, she lacks standing to use the allegedly unconstitutional

limitation on the president's power to remove the Commissioner as a basis for remand.  Further,

because the ALJ otherwise applied proper legal standards and reached a decision supported by

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

substantial evidence, I recommend that the Commissioner's final decision denying Steiner's

applicaitons for DIB and SSI be affirmed.

## I.  **Procedural History**

Steiner applied for DIB on October 24, 2018 and SSI on October 29, 2018.

(Tr. 197-209).[2]  She said that she became disabled on June 1, 2018, due to: (1) back problems,

(2) hip problems, (3) knee pain, (4) migraines, (5) anxiety, and (6) depression.  (Tr. 238, 242).

The SSA denied Steiner's applications initially and upon reconsideration, (Tr. 74-87, 105-117),

and Steiner requested a hearing before an ALJ.

ALJ Carrie Kerber heard Steiner's case on January 8, 2020 and denied the claim in a

March 19, 2020 decision.[3]  (Tr. 10-23, 37-73).  In doing so, the ALJ determined at Step Four of

the sequential evaluation process that Steiner had the residual functional capacity ("RFC") to

perform sedentary work, except that:

> [Steiner can:] stand and walk a total of four hours in an eight-hour workday and requires
> the ability to alternate positions between sitting and standing, alternatively,
> approximately every 30 minutes; occasionally climb ramps and stairs; never climb
> ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no
> exposure to unprotected heights or dangerous machinery; capable of understanding,
> remembering, and carrying out simple tasks and limited to a work routine that is
> repetitive from day to day with few and expected changes.

(Tr. 16).  Based on vocational expert testimony that a hypothetical individual with Steiner's age,

experience, and RFC could work in such available positions as a document preparer, cashier, and

an inspector/sorter, the ALJ determined Steiner was not disabled.  (Tr. 22-23).  On November 9,

2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision

---

[2] The administrative transcript appears in ECF Doc. 11.
[3] The ALJ determined that Steiner's DIB claim was barred by the doctrine of res judicata based on
Steiner's prior applications.  (*See* Tr. 10).  Accordingly, my review of the merits of the ALJ's decision
only applies to Steiner's SSI claim.

of the Commissioner.  (Tr. 1-3).  And, on January 1, 2021, Steiner filed a complaint to obtain

judicial review.  ECF Doc. 1.

II.   **Evidence**

   A.   **Personal, Educational, and Vocational Evidence**

Steiner was born on May 31, 1985 and was 33 years old on the alleged onset date.

(Tr. 238).  She completed eleventh grade in 2002, and she had previously worked as a cashier,

cleaner, deli worker, and a nurse aid.  (Tr. 243).

   B.   **Relevant Medical Evidence**

Steiner limits her challenge to the ALJ's Step Four evaluation of the medical opinion

evidence of Dr. Osinowo's mental health opinions; thus, it is only necessary to summarize the

evidence related to those opinions and the medical conditions they concern.  *See generally* ECF

Doc. 12.

On January 25, 2018, Steiner was seen at the Family Healthcare of Northwest Ohio

regarding her anxiety.  (Tr. 334).  She was observed as having coherent speech of normal rate

and volume, normal thought content, the ability to perform basic mathematic computations and

abstract reasoning, and intact associations.  *Id.*  Her mood and affect were noted as "anxious,

depressed and tearful," and her judgment and insight were "questionable."  *Id.*  Steiner was

encouraged to increase her positive coping and social support.  *Id.*

On January 25, 2018, Steiner completed a mental health screening form, indicating that

nearly every day for the past two weeks she felt: (i) little interest or pleasure in doing things;

(ii) trouble falling or staying asleep or sleeping too much; (iii) feeling tired or having little

energy; and (iv) proof appetite or overeating.  (Tr. 349).  Nearly half of the days, she also: (i) felt

down, depressed, or hopeless; (ii) felt bad about herself; and (iii) had trouble concentrating on

things.  *Id.*  She also had several days where she moved so slowly or was so fidgety that others could notice or had thoughts that she would be better off dead or hurting herself.  *Id.*  She indicated that these thoughts made it extremely difficult for her to work, take care of her home, or get along with other people.  *Id.*

On December 20, 2018, Steiner met with staff from Foundations Behavioral Health Services ("Foundations"), regarding her depression.  (Tr. 753).  Steiner underwent an assessment, which indicated that her strengths were caring and wanting to help others, and that she was a caregiver, healthy, living independently, and could provide for her basic needs.  *Id.*  She reported that her depression had caused her to have no appetite, and she could not fall asleep or stay asleep because her brain would not shut off.  (Tr. 757).  She also experienced mood swings, a depressed mood based on her trouble sleeping, issues eating, feelings of worthlessness and being "down," fatigue, anxiety, and sadness.  (Tr. 758).  She also reported struggling with bereavement based on her ex-boyfriend passing away and having a loss of focus and concentration.  *Id.*  She reported being stress by various circumstances in her life, such as her finances and past relationship.  (Tr. 759).  The staff observed Steiner as being well groomed and having clear speech and average demeanor, eye contact, and activity.  (Tr. 760).  They also noted she had circumstantial thought processes and fair insight.  (Tr. 761).  They indicated she was in a moderately depressed mood and had normal full affect, cooperative behavior, average intelligence, and no cognitive impairment.  (Tr. 761-762).

On December 20, 2018, the same day, Steiner also met with a counselor for a diagnostic assessment.  (Tr. 787).  The counselor noted that Steiner participated in the session and was "open for therapeutic suggestions," as she processed her struggled with anxiety, depression symptoms, and how those affected her daily life.  (Tr. 788)*.*

4

From January 9, 2019 to April 2, 2019, Steiner met with her counselor and other Foundations' staff for mental health treatment about twice a month.  (Tr. 767-777, 790-797). During her counseling sessions, she was consistently noted as participating in the session, being open to suggestions, and processing her feelings or situation.  (Tr. 790-797).  During her later sessions, Steiner was noted as being anxious due to housing struggles, her SSI application, or her personal relationships.  (Tr. 769-774, 777).

On April 2, 2019, Steiner met with a new counselor and reported that she was having difficulty sleeping and was feeling anxious, depressed, overwhelmed, hopeless, unmotivated, and irritable.  (Tr. 775).  She was observed as being anxious, but having an appropriate affect, fair insight, and a coherent thought process.  *Id.*

On April 2, 2019, Steiner also met with Thomas Osinowo, MD, from Foundations, regarding her depression and anxiety.  (Tr. 736-740).  Steiner reported experiencing tiredness, irritability, tearfulness, poor energy, anhedonia, feelings of hopelessness and worthlessness, and thoughts of not living.  (Tr. 736).  She also reported having a prior abusive relationship but functioned "reasonably okay" in the community.  *Id.*

Dr. Osinowo observed that Steiner was anxious but appropriate in appearance, had both good and poor eye contact, and was well dressed.  (Tr. 738).  Her speech had increased latency and was coherent, rational, and slow.  *Id.*  Her mood was anxious, depressed, and irritable and her affect was constricted, dysphoric, and flat.  *Id.*  She did not report any suicidal or homicidal thoughts and she was hopeful.  (Tr. 739).  She also did not have any perception issues; was orientated to date, place, and person; and had a good memory.  *Id.*  Dr. Osinowo diagnosed Steiner with severe major depressive disorder, with recurrent episodes.  (Tr. 740).

On April 5, 2019, Steiner saw her counselor and was noted as participative and open to therapeutic suggestions in processing a break-up with her boyfriend and housing situation. (Tr. 798).

On April 16, 2019, Steiner saw Dr. Osinowo and reported that she had some improvement with her appetite, energy, and concentration, but was still anxious and having panic attacks. (Tr. 741-742). Dr. Osinowo observed that she was appropriate in appearance, she made good eye contact, her speech was rational and had a good flow, her mood was anxious and "okay," and her affect was anxious. (Tr. 742). He noted that she was also orientated to date, place, person, city, day, and season. (Tr. 743). She also had good memory. *Id.*

On April 16 and 26, 2019, Steiner had additional sessions with her counselor. (Tr. 781, 800). Steiner was noted as engaged or participative and continued processing her anxious feelings and depressed thoughts, but during her latter session, she noted that she felt better about her upcoming moving and was focusing on caring for herself and her children. *Id.*

On May 14, 2019, Steiner saw Dr. Osinowo and reported further improvement with her anxiety and, generally, the same improvements as before. (Tr. 745-746). Dr. Osinowo's observations of her functioning were the same. (Tr. 746-747).

On June 24, 2019, Steiner saw a different counselor, who reported that she provided active and supporting listening and encouraged Steiner with positive coping skills. (Tr. 783).

On July 16, 2019, Steiner met with Dr. Osinowo. (Tr. 749). She reported that she did not think the medication was working well because she was "constantly stressed" and overwhelmed, she was having problems eating and with anxiety, and her energy and concentration were not as good. (Tr. 750). Dr. Osinowo's observations were, generally, the same. (Tr. 750-751).

6

On July 16, 2019, Steiner met with her counselor, reporting a lack of motivation and energy and an increased anxiety and depression associated with her feelings of worthlessness and failure as a mom.  (Tr. 785-786).  The counselor reported that Steiner's mood was depressed, her affect was tearful, her insight was fair, she had goal-driven thought processes, but had poor sleep and appetite.  (Tr. 785).

On July 22, 20219, Steiner had another counseling session where she was reported as being participative and processing the loss of her job and financial stress.  (Tr. 1275).

From August 13, 2019 to October 15, 2019, Steiner met with Dr. Osinowo once a month. (Tr. 1263-1275).  Initially, she reported that she was doing "good in her mood" but was struggling financially; but in later sessions, she reported feeling overwhelmed as a single parent and struggling with her eating, anxiety, and panic attacks.  (Tr. 1264, 1268, 1272). Dr. Osinowo's observations were the same.  (Tr. 1264-1265, 1268-1269, 1272-1273).

### C.  Relevant Opinion Evidence

#### 1.  Function Report – Tina Steiner

On November 25, 2018. Steiner completed a function report, evaluating the limitations caused by her conditions.  (Tr. 250-257).  She indicated that she lived with her two children and she had difficulty walking, standing, and bending over due to her back and right hip.  (Tr. 250). On a typical day, she would get her children ready for school, load a wood stove, do household chores, pick the children up, prepare dinner, do the dishes, and then put both children to bed. (Tr. 251).  She explained that she took care of her children, but her four-year-old demanded more attention, and she also cared for their dog and cat.  *Id.*  Before her conditions, she was able to do her activities without pain but now her back and hip pain kept her from getting comfortable.  *Id.* She did not need any reminders about her personal care, but she set an alarm for when she

needed to take her medicine.  (Tr. 252).  She prepared meals daily and cleaned the house, did laundry, made household repairs, mowed the grass, and did dishes, and she did not need encouragement to do those activities.  *Id.*

Steiner stated that she went outside every day, drove and rode in a car, and could go out alone.  (Tr. 253).  She went shopping in stores (about twice a week for "a couple of hours") and online for groceries, household items, and clothes.  *Id.*  She could handle her finances but was having trouble obtaining work to pay her bills.  (Tr. 253-254).  Her hobbies included reading, relaxing, playing cards, and hanging out with her children.  (Tr. 254).  She still did these activities "almost every day" but could not sit in one spot for very long when doing them.  *Id.*  She would spend time with others a "few times a week."  *Id.*  She did not need reminders to go places or anyone to accompany her.  *Id.*  She did not have trouble getting along with others or authority figures, but she did not go out much because of her pain.  (Tr. 255, 257).  She did not handle stress well because of her anxiety but handled changes in her routine "ok."  (Tr. 257).  Her conditions impacted her ability to concentrate, and she could finish what she started, follow written instructions well, and following spoken instructions with a "little difficult[y]."  (Tr. 255).

### 2.      Consultive Opinion – Michael Wuebker, Ph.D.

On January 31, 2019, Steiner underwent an evaluation by psychologist Michael Wuebker, Ph.D.  (Tr. 602).  During their interview, Dr. Wuebker observed that Steiner was clean, neat, and appropriately dressed; she was cooperative, maintained adequate eye contact, and had no difficulty responding appropriately to questions.  (Tr. 605).  He found her speech clear and understandable; her tone and pace were within normal limits; her thought content was logical and coherent; and her auditory comprehension was adequate and oral delivery was effective.  *Id.*

8

Dr. Wuebker also observed that Steiner's mood was not depressed, and her affect was appropriate, and that she spoke of being irritable, isolating herself, having trouble falling and staying asleep, and feeling like she wasn't "good enough." *Id.* She also noted that her mind raced. *Id.* On a scale of 1 to 10, she reported that her mood difficulties were a 7. *Id.* She also expressed periods of anxiety that caused her heart to race, shortness of breath, nausea, and sweat. *Id.* Dr. Wuebker noted that there was no clinical evidence of a thought disorder. (Tr. 605-606).

Dr. Wuebker also observed that Steiner was orientated to person, place, time, and situation; she did not demonstrate any "clouding of consciousness;" she correctly counted backwards from 20, but she was not able to perform a serial seven-subtraction exercise. (Tr. 606). Although Steiner knew the president and could make change, she did not know the Ohio governor and replied that she would need a calculator to answer what nine times eight was. *Id.* Dr. Wuebker reported that her memory appeared intact, and she appeared to be functioning in the low average range of cognition. *Id.* He also observed that she had adequate insight and ability to make common sense judgments. *Id.*

In summary, Dr. Wuebker assessed that Steiner was functioning in the low average range of intelligence, could be expected to understand and apply instructions appropriately for one step and a few more complex workplace instructions, her attention was sufficient to answer questions, and she had difficulties concentrating at work but completed her tasks. (Tr. 607). He also reported that nothing suggested she had difficulty getting along with co-workers and supervisors and she seemed capable of responding appropriately to work setting stressors. *Id.*

### 3. Medical Opinion – Thomas Osinowo, MD

On January 14, 2020, Dr. Osinowo completed a "Medical Source Statement as to Ability to Perform Work Related Activities" for Steiner. (Tr. 1277-1279). As to Steiner's social

9

interaction abilities, he reported that she was moderately limited in her ability to: (i) accept instruction from or respond appropriately to criticism from supervisors or superiors; (ii) respond appropriately to co-workers or peers; and (iii) relate to the general public and maintain socially appropriate behavior.  (Tr. 1277).  He found that she had a marked limitation in her ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes.  *Id.*  He indicated that a restriction to minimal contact or interaction with others would not alter his opinion.  *Id.*

As to Steiner's concentration and persistence, Dr. Osinowo indicated that she was moderately limited in her ability to: (i) perform and complete work tasks in a normal workday or work week at a consistent pace; (ii) work in cooperation with or in proximity to others without being distracted by them; and (iii) process subjective information accurately and to use appropriate judgment.  (Tr. 1278).  She had marked limitations, however, in her ability to: (i) carry through instructions and complete tasks independently; (ii) maintain attention and concentration for more than brief periods of time; and (iii) perform at production levels expected by most employers.  *Id.*

As to her adaptation, Dr. Osinowo indicated that Steiner was moderately limited in her ability to: (i) respond appropriately to changes in work settings; (ii) remember locations, workday procedures, and instruction; (iii) behave predicably, reliably, and in an emotionally stable manner; and (iv) tolerate customary work pressures.  *Id.*  He found that she had mild limitations in her ability to be aware of normal hazards and take necessary precautions and to maintain personal appearance and hygiene.  *Id.*

In general, Dr. Osinowo opined that Steiner would have partial or full-day unscheduled absences from work for five or more days per month due to her conditions and her condition

would likely deteriorate if placed under the stress of full-time employment.  (Tr. 1279).

Specifically, he noted that she had anxiety, panic attacks, and lower back pain.  *Id.*  He indicated

that Steiner's condition existed and persisted as consistent with his assessment since October 12,

2018 and that he had reviewed his treatment notes in completing the statement.  *Id.*

### 4.    State Psychological Consultants

On February 4, 2019, Leslie Rudy, PhD, reviewed the medical evidence related to

Steiner's mental abilities and found that there was insufficient information to review the extent

of her limitations.  (Tr. 81-82).  However, in determining whether Steiner met the requirement

for a medically determinable mental health impairment, Dr. Rudy found that Steiner had only

mild limitations in her interactions with others and her ability to understand, remember, or apply

information.  (Tr. 81).  On February 28, 2019, Paul Tangeman, PhD, found that the record

supported Dr. Rudy's findings on reconsideration.  (Tr. 110-111).

### D.    Relevant Testimonial Evidence

Steiner testified at the hearing.  (Tr. 42-67).  She was then working at Walmart about 19

to 24 hours a week as a cashier.  (Tr. 45).  Since she started working in July 2019 she had called

off a couple of times, two of which she remembered.  (Tr. 45-46).  She explained that she

believed she was disabled because, after a car accident when she was 18, she had had continual

back pain, which caused her everyday activities to be a struggle and her to suffer with depressed

and anxiety.  (Tr. 49-50).  After reviewing her medication, Steiner said she sometimes had

difficulty remembering to take it but would usually remember it later that day.  (Tr. 52).  Steiner

described her typical day as getting up and getting her children ready for school, getting them on

the school bus, her resting until school was over, picking the kids up from school, and then

heading work.  (Tr. 49, 53).  After work, she would come home, put her kids to bed, and then relax before heading to bed.  (Tr. 53-54).

Regarding her depression, Steiner explained that she was on medication because she would become so depressed that she did not eat, which caused her weight to fluctuate.  (Tr. 57). She did not think her medication was working because she still did not have any desire to do anything, she felt sad or worthless, and she was overthinking.  (Tr. 58).  She did not have any difficulty getting along with others, but she noticed problems in her concentration.  (Tr. 59).  She had anxiety attacks at least once a day, sometimes more, with each lasting "maybe" 20 minutes and causing her heart to race, difficulty breathing, and tearfulness.  (Tr. 60).  She met with a psychologist every two months and a counselor every two weeks.  *Id.*  When her depression was bad and she could not do things, she would ask her older daughter to help.  (Tr. 64-65).  She would take extra breaks at work depending on how bad her anxiety was.  (Tr. 65).

## III.   Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted to merely overlooked.").

## B.    Separation of Powers

Steiner contends that the ALJ's decision came after and was based on an unconstitutional delegation of authority to the Commissioner that violated separation of powers principles, warranting demand.  ECF Doc. 12 at 12-13.  Steiner argues that the SSA's statute governing removal of the Commissioner, 42 U.S.C. § 902(a)(3), implicates the same concerns that the Supreme Court addressed in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.

Ct. 2183 (2020) (hereafter "*Seila Law*"), which held that that Consumer Financial Protection

Bureau's ("CFPB") removal structure was unconstitutional.  ECF Doc. 12 at 12-14.  This

structure, she asserts, results in the Commissioner, and those deriving their authority from the

Commissioner, acting on improperly delegated authority in deciding SSA claims and issuing

policies.  ECF Doc. 12 at 12-14.  Because of the improper delegation and creation of policies in

effect during her application, Steiner contends remand is warranted.  ECF Doc. 12 at 16.  She

adds that the Department of Justice identified this potential constitutional defect decades ago

and, thus, any defense of it now would been to be explained.  ECF Doc. 12 at 15-16.

The Commissioner concedes that § 902(a)(3) is unconstitutional but contends that

remand is unwarranted.  ECF Doc. 13 at 2-3.  The Commissioner argues that, under *Collins v.*

*Yellen*, 141 S. Ct. 1796 (2021), Steiner must show that the removal provision actually caused her

harm; and this, the Commissioner argues, she has failed to do because: (1) the ALJ in Steiner's

case was appointed under the Acting Commissioner and, thus, was not subject to the offending

provision; and (2) Steiner has not shown any harm because the decision on her application was

unaffected by the unconstitutional removal provision within the statute.  ECF Doc. 13 at 3-9.

Additionally, the Commissioner argues that remand is not proper under the harmless error

doctrine, the *de facto* officer doctrine, the rule of necessity, and prudential considerations.  ECF

Doc. 13 at 9-14.

Steiner contends in her reply brief that the Commissioner's concession that § 902(a)(3) is

unconstitutional results in it being undisputed that her constitutional rights were violated and,

thus, she has standing to challenge her decision on the ground, relying on *Seila Law* and district

court cases.  ECF Doc. 15 at 6-7.  Additionally, she argues that § 902(a)(3) is an even more

egregious constitutional violation because it restricts the president's authority to even fewer

circumstances but also applies it to the Commissioner or an "[a]n individual serving in the Office of Commissioner," resulting in even the acting Commissioner being subject to it. ECF Doc. 15 at 7-9. Steiner asserts six specific injuries stemming from the alleged constitutional violation, all of which relate to the process used to adjudicate her application. ECF Doc. 15 at 9-10. She adds that the Commissioner has waived any defense as to the unconstitutional actions of the Appeals Council and, even if waiver was not found, she is still entitled to remand. ECF Doc. 15 at 10-24. Specifically as to traceability, Steiner contends that prejudice to her can be presumed because the ALJ was exercising unlawful power and, even if a more strict showing was required, the events surrounding former Commissioner Saul's removal demonstrated that President Biden wanted to but refrained from removing Saul, which occurred while Steiner's claim was pending before the Appeals Council. *See* ECF Doc. 15 at 16-18, 21-24. Lastly, Steiner contests the application of the various doctrines the Commissioner relies on in support of her harmlessness argument. ECF Doc. 15 at 24-29.

In *Collins*, the Supreme Court reviewed the constitutionality of the Federal Housing Financial Agency's statutory removal structure for directors, which prohibited the president from removing the directors except "for cause." 141 S. Ct. at 1783. The Court held that the limitation on the president's removal authority over a federal executive branch agency director violated the principle of separation of powers. *Id.* at 1783. In doing so, the Supreme Court relied on its prior precedent in *Seila Law*. *Id.* In *Seila Law*, the Court held that the CFPB statutory removal structure, which limited the removal of the CFPB Director by the president only to instances of "inefficiency, neglect of duty, or malfeasance of office," violated the principle of separation of powers between Congress and the Executive Branch. *Id.* at 2197.

15

Before analyzing the merits of Steiner's constitutional argument, the court has an obligation to ensure it has jurisdiction. *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Regardless of whether the parties address the issue, the court must ensure the parties have standing to raise the claim asserted. *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019) ("One essential aspect of this [jurisdiction] requirement is that any person invoking the power of a federal court must demonstrate standing to do so" (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

The standing requirement enforces the Constitution's limitation that the Judicial Branch may only decide "Cases" and "Controversies." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992). To demonstrate standing, a plaintiff must show that she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Id.* at 560-561 (internal alterations removed).

As to "traceability," the Supreme Court held in *Collins* that a plaintiff challenging a statutory removal provision for an executive officer could demonstrate standing "by showing that [she] was harmed by an action that was taken by such an officer and that the plaintiff alleges was void." 141 S. Ct. at 1788 n.24; *see also Collins*, 141 S. Ct. at 1779 (finding standing to challenge statutory removal protections for FHFA Director when alleged financial injury was traceable to the FHFA's adoption and implementation of a policy that deprived defendants of shareholder profits) (quoting *Seila Law*, 140 S. Ct. at 2196 (("In the specific context of the President's removal power, we have found it sufficient that the challenger sustains injury from an executive act that allegedly exceeds the official's authority" (brackets and internal quotation marks omitted))). However, the Court explicitly clarified that this "holding on standing does not mean

16

that actions taken by such an officer are void *ab initio* and must be undone." 141 S. Ct. at 1788 n.24.

I find that Steiner has failed to establish "an injury in fact" traceable to the Commissioner's work while subject to an allegedly unconstitutional removal statute. An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). Steiner initially asserts only that the alleged separation of powers issue contaminated the administrative process by which a decision was reached on her claim and that a "presumptively inaccurate" legal standard was used. However, she cites no authority for her presumption. *See* ECF Doc. 12 at 13.

In her reply, Steiner elaborates on the traceability of her constitutional injury, although phrased in terms of causation, contending that the ALJ lacked authority to issue the decision on her claim because the Commissioner lacked the ability to delegate that authority to him. ECF Doc. 15 at 18-20. However, *Collins* directly addressed this and found no imputed error, holding that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207-2211). The Court reasoned that because the relevant statute "unconstitutionally limited the President's authority to *remove*" the officer – but there was no constitutionally defective aspect of his appointment to the office, there was "no reason to regard the actions taken by the [agency] . . . as void." *Id.* at 1787 (emphasis in original). As a result, Steiner has not shown that the constitutional violation – alone – impacted *her* claim, whether

before the ALJ or the Appeals Council.  *See Rives v. Comm'r of Soc. Sec.*, No. 1:20-CV-2549, 2022 WL 681273, *2-3 (N.D. Ohio Mar. 8, 2022).

Steiner does make the additional argument that former Commissioner Saul's tenure was contrary to the intentions of President Biden, who otherwise would have removed Saul.  *See* ECF Doc. 15 at 21-24.  However, Steiner relies solely on the timing of various circumstances to infer the president's wishes.  Even though the Steiner has raised potentially valid concerns, the court cannot speculate as to the president's state of mind in not removing Saul sooner.

Absent some argument or evidence demonstrating a personal connection between the Commissioner's exercise of authority or promulgation of policies on her claim, Steiner asks this court to base its jurisdiction on a generalized grievance.  And this has long been insufficient to constitute a "Case" or "Controversy."  *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).  Steiner cites *Seila Law*'s discussion of standing for the premise that the constitutional violation alone is sufficient to substantiate her standing.  *See* ECF Doc. 15 at 7. However, the *Seila Law* Court's discussion of standing is readily distinguishable from Steiner's circumstances because, there, Seila Law sought to avoid producing documents subpoenaed by the CFPB and, thus, the authority of the CFPB to make that request was directly connected to the injury Seila Law was seeking to avoid.  *See Seila Law*, 140 S. Ct. at 2194-96.  Steiner has alleged no such specific injury, nor has she asserted such a traceable relationship between her alleged injury and the ALJ's delegated authority.

18

Because of these failings, Steiner has failed to meet her burden of establishing standing. *Bethune-Hill*, 139 S. Ct. at 1950.  I find and recommend, therefore, that we not decide the merits of her constitutional challenge.

### C.    Step Four: Medical Opinion Evidence

Steiner contends that the ALJ erred by misevaluating the medical opinion of Dr. Osinowo.  ECF Doc. 12 at 7.  She argues that, although the ALJ addressed the "consistency" and "supportability" of Dr. Osinowo's opinions, she did so superficially, as if incanting magic words was enough to complete the analytical task.  And she contends that the ALJ's conclusions regarding supportability and consistency are not justified when the entire record is considered. ECF Doc. 12 at 8.  Steiner contends that the ALJ did not properly consider the treatment notes Dr. Osinowo provided in support of his opinion and the ALJ's characterization of the record, with regard to the consistency factor, was erroneous.  ECF Doc. 12 at 8-11.  The Commissioner responds that the ALJ did not err because Dr. Osinowo's opinions were only checkbox forms without explanation and, thus, deficient from an evidentiary perspective.  ECF Doc. 13 at 14-15. Steiner asserts in her reply brief that the Commissioner wrongly viewed Dr. Osinowo's checkbox forms in a vacuum and ignored his other treatment notes.  ECF Doc. 15 at 4-5.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 416.920(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 416.920c(a).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s),

but generally is not required to discuss other factors.  20 C.F.R. § 416.920c(b)(2).[4]  According to

the regulation, the more consistent a medical opinion is with the evidence from other medical

and nonmedical sources, the more persuasive the medical opinion will be.  This is the

consistency standard.  And the regulation specifies that the more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion, the more persuasive the medical opinion will be.  This is the supportability

standard.  *See* 20 C.F.R. § 416.920c(c)(1)-(2).

The ALJ applied the proper legal standards and reached a decision supported by

substantial evidence in finding Dr. Osinowo's opinion unpersuasive.  42 U.S.C. § 1383(c)(33);

*Rogers*, 486 F.3d at 241.  The ALJ met her obligations under 20 C.F.R. § 416.920c(c) by

identifying and discussing those factors supporting Dr. Osinowo's opinion and any

inconsistencies with the other medical evidence.  (*See* Tr. 16, 20-21).  Dr. Osinowo found that

Steiner had marked limitations in her ability to work in proximity to others without distracting

them and in her ability to (i) carry through on instructions and complete a task; (ii) maintain

attention and concentration for more than brief periods of time; and (iii) perform a production

levels expected by most employers.  (Tr. 1278).  In finding Dr. Osinowo's opinion unpersuasive,

the ALJ addressed these same points, stating that "[Dr. Osinowo's opinion] is not persuasive as it

is inconsistent with and not supported by the claimant's treatment notes," noting that his

treatment notes indicated Steiner had fair judgment, insight, attention, concentration, and a good

memory.  (Tr. 21).  The ALJ also identified several inconsistencies between Dr. Osinowo's

opinions and the other record evidence, pointing out that Steiner's own function report stated she

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 416.920c(c)(3)-(5).

had no problems getting along with others and Steiner's testimony that she only called off work twice and picked up and dropped off her children daily from school. (Tr. 21). As such, the ALJ identified and provided justifications for finding that Dr. Osinowo's opinion was both unsupported and inconsistent. 20 C.F.R. § 416.920c(c).

It is worth noting that the ALJ's statement that Steiner dropped her children off at school is inaccurate based on Steiner's testimony, which is concerning. (*See* Tr. 49). The ALJ also referred to both supportability and inconsistency when discussing Dr. Osinowo's own treatment notes and his opinion's consistency with other medical records and, thus, may have conflated the standards. *See* 20 C.F.R. § 416.920c(c)(1)-(2). However, both of these errors, are ultimately harmless. Although the ALJ's description of Steiner's activity in transporting her children was inaccurate, that alone does not undermine the substantial evidence that otherwise supported the ALJ's decision, as discussed more fully below. Further, the ALJ's possible confusion is benign in its effect as the ALJ's discussion reflects the proper consideration of each factor's substance. *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted))

Steiner contends that the ALJ's discussion was insufficient, providing only a general citation to record evidence, mischaracterizing the record, and, generally, failing to consider Dr. Osinowo's opinions in the context of the entire record. And she is correct that the ALJ's discussion could have been *much* more expansive. The points of support or inconsistency identified by the ALJ plainly do not rebut every part of Dr. Osinowo's opinion. For example, having a good memory does not necessarily mean that Steiner could overcome the work absences he predicted. But – an ALJ is not required to discuss every piece of evidence nor

highlight every inconsistency.  See *Davidson v. Berryhill*, No. 3:16-CV-2621, 2017 WL 4682343, at *17 (N.D. Ohio, Oct. 18, 2017) (finding that the ALJ need not discuss every piece of evidence in the record but may not fail to acknowledge evidence that potentially supports a finding of disability).  And the lone misstatement of the record did not violate Steiner's substantial rights.  See *Bowen*, 478 F.3d at 746.

It is more concerning that the paragraph in which the ALJ discussed Dr. Osinowo's opinion appears to have glossed over contrary evidence.  However, an imperfect paragraph is not fatal to the ALJ's decision, because the court is required to look at the decision as a whole. *Buckhannon ex. Rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense).  In doing so, I find that the ALJ acknowledged Dr. Osinowo's opinions, Steiner's testimony regarding her daily anxiety and depression, notes from counselors indicating she was depressed and anxious, and Dr. Wuebker's assessment that Steiner had difficulty maintaining her attention and concentration.  (Tr. 17, 19-20).  The ALJ's discussion needed only to provide a sufficient explanation to create a "logical bridge" between the evidence and her determination and to permit meaningful review.  *Fleischer*, 774 F. Supp.2d at 877.  This she did.

The Commissioner argues in support of this finding – albeit based on different reasoning. The Commissioner contends that Dr. Osinowo's medical statement was patently faulty as it was expressed on a checkbox form without any explanation.  The Commissioner is correct that that Dr. Osinowo's checkbox assessment is considered "patently deficient" in almost every limitation because of the lack of explanation (the only exception being Steiner's absenteeism where he provided additional specification).  See *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016) (holding that a checkbox opinion, even with other treatment notes, was

patently deficient to provide persuasive medical evidence).  There is, however, one serious flaw

with the Commissioner's argument: the ALJ never mentioned that the opinion was a checkbox

form.  And, the Commissioner's post-hoc rationalizations cannot be used to justify the ALJ's

actions.  *Steckroth v. Comm'r of Soc. Sec.*, No. 11-10473, 2012 U.S. Dist. LEXIS 44895, *27-28

(E.D. Mich. Mar. 30, 2012) (quoting *Hyatt Corp. v. NLRB*, 939 F.2d 361, 367 (6th Cir. 1991)

("Courts are not at liberty to speculate on the basis of an administrative agency's order. . . . [nor

is the court] free to accept 'appellate counsel's rationalization for agency action in lieu of reasons

and findings enunciated by the Board.'") (citations omitted)).

    Nevertheless, the ALJ satisfied her obligations under the regulations and reached a

determination supported by substantial evidence.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d

at 241.  As to supportability, such evidence included that Dr. Osinowo's treatment notes almost

exclusively found that Steiner was: (1) appropriate in appearance with good eye contact and was

well dressed (Tr. 738, 742-43, 746, 750, 1264, 1268, 1272); (2) was fully orientated (Tr. 739,

743, 747, 751, 1265, 1269, 1273); (3) had a good memory (Tr. 739, 743, 747, 751, 1265, 1269,

1273); and (4) never indicated that she failed to get along with others, had issues with authority,

or had trouble concentrating or persisting in concentrating.

    Moreover, substantial evidence supported the ALJ's determination that Dr. Osinowo's

opinion was inconsistent with other record evidence.  Such evidence includes: (1) treatment

notes indicating that Steiner's speech, thought content, and thought processes were normal

(Tr. 334, 760, 775, 785); (2) treatment notes indicating she had a normal affect and was

cooperative or participative during her counseling sessions (Tr. 761, 771, 790, 792, 794, 796,

798, 1275); (3) Steiner's consistent openness to therapeutic suggestions during her sessions

(Tr. 790, 792, 794, 796, 798); (4) Steiner's own assessment that she only missed work "a couple

of times" in the preceding two years and took care of her children and home, despite her pain (Tr. 45-46, 59, 250-257); (5) Steiner's function report that indicated she got along with others, her hobbies included reading and playing cards, and she could finish what she started, follow written instructions, and had a "little difficulty" following spoken instructions (Tr. 254-257); and (6) Dr. Weubker's assessment that Steiner could understand and apply instructions, had a sufficient attention span, and had no difficulty getting along with others. (Tr. 607). Accordingly, the ALJ's decision was supported by substantial evidence and fell within her "zone of choice." *Mullen*, 800 F.2d at 545. I recommend that the ALJ's determination that Dr. Osinowo's opinion was unpersuasive be affirmed.

## IV. Recommendation

Because Steiner failed to demonstrate an injury in fact traceable to the Commissioner's delegated authority, I recommend that Steiner be found to lack standing to pursue her asserted constitutional violation. Further, because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Steiner's applications for DIB and SSI be affirmed.

Dated: May 18, 2022

Thomas M. Parker
United States Magistrate Judge

24

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, \*2 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).